UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of
PJSC "URALSIB BANK",

For an Order Pursuant to 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign Proceedings

Case No. 21 Misc._____

## DECLARATION OF DMITRY I. BOGORODSKY IN SUPPORT OF *EX PARTE* APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, the undersigned, Dmitry I. Bogorodsky, under oath and penalty of perjury, pursuant to 28 U.S.C. § 1746, and duly authorized, declare the following:

1.      I am over the age of 18 and the facts set forth herein are based on my own personal knowledge or from information provided to me by others. Where facts are within my personal knowledge, I can affirm that they are true. Where the information is provided to me by others, I state the source of my knowledge and affirm it is true to the best of my information and belief.

2.      I am a director at the Special Projects Division, which is a part of the Distressed Assets Department of PJSC "URALSIB BANK" ("Applicant"). I am also an in-house counsel for Applicant in the pending foreign proceeding described below. I am qualified under Russian law and have over 14 years of experience in domestic and cross-border litigation.

3.      I submit this Declaration in support of Applicant's application for an Order, pursuant to 28 U.S.C. § 1782, authorizing discovery in connection with a pending foreign bankruptcy proceeding before the Commercial Court of the Rostov region, in Russia, by Applicant against a Russian individual Denis D. Smyslov ("Mr. Smyslov") to recover a debt in

the amount of USD 4,393,150.84 (RUB 323,412,781.66)[1] owed by Mr. Smyslov to Applicant (the "Debt") (the "Russian Proceedings").

## I.     FACTUAL BACKGROUND

4.     Applicant is one of the largest privately owned banks in Russia, that has headquarters in Moscow and operates throughout the country.

5.     Mr. Smyslov is a Russian citizen who was an active businessman in the U.S. and Russia between 2004 and 2016. Over this period, he founded a group of U.S. companies collectively named "Red Mountain Group". The Red Mountain Group specialized in the oil field servicing and mid-stream natural gas processing.

6.     In May of 2008 Mr. Smyslov founded a Russian company named Premium Engineering LLC ("PREMIUM ENGINEERING"), which was Mr. Smyslov's main business in Russia. The primary source of funding of PREMIUM ENGINEERING were loans provided by major Russian banks, including Applicant.

7.     In December 2015, Applicant commenced the Russian Proceedings for breach of contract against Mr. Smyslov, PREMIUM ENGINEERING, and Red Mountain Energy Corporation ("RMEC") for repayment of the Debt.

**The Underlying Debt**

8.     On September 30, 2014, Applicant entered into a Credit Facility Agreement No 0110/14-KL-N ("CFA") with PREMIUM ENGINEERING. Under the terms of CFA, Applicant would make available to PREMIUM ENGINEERING a term loan facility in a maximum amount of RUB 300,000,000.00.[2] PREMIUM ENGINEERING agreed to repay the loan until March 31, 2015 and to pay interest of 13.9% per annum on a monthly basis. Between

---

[1] Applied exchange rate (RUB to US$) 73.6175:1 as of July 5, 2021.
[2] USD 7,616,803.68 (Applied exchange rate (RUB to USD) 39.3866:1 as of September 30, 2014).

the 1st and 22nd of October 2014, Applicant advanced the loan to PREMIUM ENGINEERING in full.

9.      On the same day (September 30, 2014), Applicant entered into a Personal Guarantee Agreement 0110/14-P-01 ("PGA") with Mr. Smyslov (**Exhibit 1**). Under PGA, Mr. Smyslov guaranteed and became surety for the prompt payment and performance of the loan, advances, debts, liabilities, obligations, covenants and duties owing by PREMIUM ENGINEERING to Applicant under CFA.

10.      A similar guarantee was provided by RMEC (together with the PGA, the "PGAs"), a U.S. company ultimately owned and controlled by Mr. Smyslov and part of the Red Mountain Group.

11.      Additionally, the loan was secured by pledge over the real property owned by PREMIUM ENGINEERING. However, the value of the property was estimated at only RUB 2,200,000.

12.      Between November 2014 and March 2015, Applicant and PREMIUM ENGINEERING signed four supplemental agreements to CFA.

13.      Ultimately, in order to restructure PREMIUM ENGINEERING's debt, both parties agreed to postpone CFA's maturity date to November 30, 2015 and increase the interest rate from 13.9% to 17% per annum.

**Collection Efforts**

14.      By early December 2015, PREMIUM ENGINEERING defaulted on its obligation under CFA. Applicant served demands on PREMIUM ENGINEERING, Mr. Smyslov and RMEC to repay debts and outstanding fees totaling USD 4,594,267.21 (RUB 310,893,143.19)[3]

---

[3] USD 55,856.56 (Applied exchange rate (RUB to US$) 67.6698:1 as of December 7, 2015).

as of December 7, 2015. However, the debtor and guarantors ignored the demands. Applicant therefore commenced legal proceedings against each of the debtor and guarantors, namely PREMIUM ENGINEERING, Mr. Smyslov and RMEC.

**Proceedings against Premium Engineering**

15.     Between July and November of 2015, a number of creditors filed petitions for the bankruptcy of PREMIUM ENGINEERING with the Commercial Court of the City of Moscow.

16.     In late December 2015, Applicant commenced legal proceedings for breach of contract against PREMIUM ENGINEERING for the outstanding Debt under the CFA.

17.     On January 16, 2016, the Commercial Court of the City of Moscow (the "Moscow Court") opened bankruptcy proceedings against PREMIUM ENGINEERING.

18.     On May 13, 2016, Applicant's claim against PREMIUM ENGINEERING was approved by the Russian court and put on PREMIUM ENGINEERING's bankruptcy proceedings' register of claims in the amount of RUB 328,418,636.18.[4]

19.     In August 2016, PREMIUM ENGINEERING was declared bankrupt by the Moscow Court. Applicant is a creditor of PREMIUM ENGINEERING's bankruptcy estate under Russian law.

20.     On August 4, 2017, Applicant initiated criminal claims against the officers of PREMIUM ENGINEERING for embezzlement of the money received from Applicant, as Applicant's investigations revealed the company's management never intended to return the loan and misappropriated the money. The investigation is still ongoing,

---

[4] USD 5,055,651.13 (Applied exchange rate (RUB to US$) 64.9607:1 as of May 13, 2016).

21.     In September of 2018, the bankruptcy trustee of PREMIUM ENGINEERING filed a claim against Mr. Smyslov with the Moscow Court to hold Mr. Smyslov personally liable for the debts of PREMIUM ENGINEERING.

22.     On April 22, 2019, the Moscow Court granted the claim of the bankruptcy trustee of PREMIUM ENGINEERING against Mr. Smyslov, and held him personally liable for the debts of the company, recognizing Mr. Smyslov caused PREMIUM ENGINEERING to enter into transactions that harmed PREMIUM ENGINEERING's creditors (**Exhibit 2**). Mr. Smyslov has not satisfied PREMIUM ENGINEERING's creditors' claims.

**Proceedings against RMEC**

23.     In late December 2015, Applicant commenced legal proceedings for breach of contract against RMEC for the outstanding Debt under the PGAs.

24.     On March 31, 2017, Applicant obtained a judgment by the Commercial Court of the City of Moscow against RMEC for RUB 323,353,781.66.[5] RMEC completely ignored the proceeding and did not present any objections. This judgment remains unsatisfied.

**Proceedings against Mr. Smyslov**

25.     In late December 2015, Applicant commenced the Russian Proceedings for breach of contract against Mr. Smyslov for the outstanding Debt under the PGAs.

26.     On May 30, 2016, the Presnensky District Court of Moscow issued a judgment granting Applicant's claim against Mr. Smyslov in full.

27.     Mr. Smyslov appealed the judgment. On December 6, 2016, the Moscow City Court (Mosgorsud) dismissed the appeal and upheld the judgment in Applicant's favor.

28.     Mr. Smyslov failed to satisfy the judgment, which remains outstanding.

---

[5] USD 5,735,470.49 (Applied exchange rate (RUB to US$) 56.3779:1 as of March 31, 2017).

29.     In late 2017, Applicant filed a petition for the bankruptcy of Mr. Smyslov with the Moscow Court.

30.     However, at the first hearing on Mr. Smyslov's bankruptcy in Moscow, Mr. Smyslov's attorney unexpectedly informed the Court that Mr. Smyslov had changed his primary address to a small apartment in the Russian city of Rostov-on-Don. The attorney filed a motion to remove the whole bankruptcy case to the Commercial Court of the Rostov region, which was granted by the Moscow Court in accordance with the Russian Bankruptcy Law.

31.     On May 30, 2018 the Commercial Court of the Rostov Region (the "Rostov Court") opened bankruptcy proceedings against Mr. Smyslov and put the Bank's claim on Mr. Smyslov's bankruptcy proceedings' register in the amount of RUB 323,412,781.66 (**Exhibit 3**).[6]

32.     On November 26, 2018 Mr. Smyslov was declared bankrupt and the Rostov Court commenced the sale of assets procedure, which is still on-going (**Exhibit 4**).

**Investigation**

*Applicant's Internal Investigation*

33.     Since the removal of the Russian Proceedings against Mr. Smyslov to the Rostov Court (around May of 2018), Mr. Smyslov has not once appeared in Court, nor has he received any correspondence at his new address in Rostov-on-Don. Shortly thereafter, Applicant's investigations revealed that Mr. Smyslov did not even own the new apartment in Rostov-on-Don presented by his attorney, and it is highly likely that the documents presented for his change of address were falsified.

---

[6] USD 5,162,874.46 (Applied exchange rate (RUB to US$) 62.6420:1 as of May 30, 2018).

34.     Considering the above-mentioned facts, the Bank has conducted an investigation of Mr. Smyslov's activities throughout the period starting from the date when the first loan was advanced to PREMIUM ENGINEERING (October 2014) and until present.

35.     A basic search through the open sources has revealed that Mr. Smyslov fled Russia by the latest in Fall 2018 and officially settled in Vilnius, Lithuania. Around the same time Mr. Smyslov's profile appeared on the website for tech founders named F6S.[7] According to the profile, Mr. Smyslov is a co-founder of the start-up named "100Nuts", who presently lives in Lithuania. It is noticeable that Mr. Smyslov describes himself as a successful businessman who has "*built from scratch Russia's most successful independent engineering firm*".

36.     Mr. Smyslov has also appeared on the corporate register of United Kingdom ("UK") companies (**Exhibit 5**). According to the UK's Companies House website, Mr. Smyslov owns between 25 and 50% of the shares in a company named 100NUTS Ltd., which was incorporated on 27 November 2017.[8] A similarly named company 100 RIEŠUTŲ, MB (which in Lithuanian means "100 Nuts") was also incorporated in Lithuania in 2019. Mr. Smyslov is referenced as the director of the company.[9]

37.     The above-mentioned facts show that Mr. Smyslov planned to flee Russia and set up a new business in Europe. It is clear that Mr. Smyslov has never intended to cooperate with the Russian courts and his creditors, and that he likely organized his own insolvency in order to evade his obligations in Russia after misappropriating the funds Applicant lent to PREMIUM ENGINEERING.

---

[7] https://www.f6s.com/denissmyslov, last visited June 28, 2021.
[8] https://find-and-update.company-information.service.gov.uk/company/11084302/officers, last visited June 28, 2021
[9] https://rekvizitai.vz.lt/en/company/100_riesutu/, last visited June 28, 2021

38.     At the next stage, Applicant focused its investigation on the companies and nominees that could be used by Mr. Smyslov to further his embezzlement schemes. First, Applicant analyzed the ownership structure of PREMIUM ENGINERING. According to the available public information and corporate documents, Mr. Smyslov owned PREMIUM ENGINERING business in Russia through a chain of offshore entities, which included Red Mountain Energy Holdings Inc. (BVI) (head company, owned solely by Mr. Smyslov), Red Mountain Energy Overseas Ltd.  (BVI) (subsidiary company, the "second layer"), Kuffner Investments Limited (Cyprus) (subsidiary company, the "third layer") and RMEG Operations AB (Sweden) (the direct owner of PREMIUM ENGINEERING).

39.     Further investigation revealed that Mr. Smyslov organized an even larger group of companies, which he managed from the office of PREMIUM ENGINEERING in Russia. Many companies were involved in illegal financial operations and simply extracted cash in favor of Mr. Smyslov's and/or his "clients". For this purpose, Mr. Smyslov set up two companies in Hong Kong – Well Step Engineering Ltd. and Del Credere Ltd (the "Hong Kong Entities"). The main individual who managed the "dark side" of Mr. Smyslov's business was his nominee Kirill Pichugin ("Mr. Pichugin"), a Russian citizen who also has moved to Lithuania around 2017-2018. In most cases, the Hong Kong Entities extracted cash through a number of shell companies.

40.     Starting from July of 2013, Mr. Smyslov primarily used a UK company named SK Inter Trading LLP for conducting his illegal financial operations. The company was formally managed by non-public offshore companies registered in the Seychelle Islands and Dominica,[10] but the documents of SK Inter Trading LLP (at least partially) were stored in the office of

---

[10] https://find-and-update.company-information.service.gov.uk/company/OC378822/officers, last visited June 28, 2021.

PREMIUM ENGINEERING. Soon after the bankruptcy of PREMIUM ENGINEERING,

SK Trading LLP and the managing companies were dissolved.

41.     The companies involved in Mr. Smyslov's financial schemes included a number

of entities in Cyprus. Mr. Smyslov headed three Cypriot companies: Strogatz Ltd., Blackcomb

Finance Ltd. and the above-mentioned Kuffner Investments Ltd. According to the corporate

register of Cyprus, the three companies were dissolved on May 16, 2018.

42.     According to Mr. Smyslov's profile on LinkedIn,[11] he also owned a publishing

company in Hong-Kong named Technopress Ltd. The company specialized in technical

publications and was dissolved on August 3, 2018. Additionally, another company from the Red

Mountain Group has been found on the corporate register of Hong Kong, which is named Red

Mountain Far East Ltd. According to the available information, this company was a contractor of

PREMIUM ENGINEERING.

43.     Applicant's investigations have also revealed three similarly named Lithuanian

companies believed to be key links in the chain of Mr. Smyslov companies, since they performed

direct payments to Mr. Smyslov and Mr. Pichugin: UAB Senzo Baltic, managed by

Mr. Smyslov's ex-wife Anna Smyslova, UAB 3d Engineering, managed by a citizen of Ukraine

Christina Mkrtchyan (a nominee), and UAB Linguarus, owned and/or controlled by

Mr. Pichugin.

44.     Considering the fact that Mr. Smyslov controlled a number of US companies, it is

highly likely that he was also involved in illegal financial activities in the US. Based on the

information from the US corporate registers, six main companies have been identified: RED

MOUNTAIN ENERGY CORPORATION (Nevada), RED MOUNTAIN ENERGY CIS, LLC

---

[11] https://www.linkedin.com/in/denis-smyslov-63923214, last visited June 28, 2021.

(Nevada), Red Mountain Properties, LLC (Missouri), ZHONGTAI AMERICA LLC (Nevada), Secure Energy International, LLC (Nevada), CBM Partners Corporation (Delaware). Most of the US companies were dissolved in the period from 2016 to 2018. Applicant believes that Mr. Smyslov has transferred the property and money from these companies in his own favor (or in favor of his nominees) right before they were liquidated.

45.     According to the registers, Mr. Smyslov managed the above-mentioned US companies together with Bruce J. Schaller, a US citizen. Mr. Schaller acted as the director, secretary and treasurer at RMEC, Red Mountain Properties, LLC and CBM Partners Corporation.

### *Investigation by Premium Engineering's bankruptcy trustee*

46.     In September of 2018 the bankruptcy trustee of PREMIUM ENGINEERING filed a claim against Mr. Smyslov with the Commercial Court of the City of Moscow to hold him liable for the debts of the company.

47.     According to the investigation conducted by the trustee of PREMIUM ENGINEERING, between 2011 and 2016 the company entered into a number of suspicious transactions, which led to the misappropriation of $64,023,406.96. Mr. Smyslov, who was the CEO of PREMIUM ENGINEERING over this period, did not take any steps to pay back any of the company's debt and, when the company went bankrupt in August 2016, he did not surrender any documents of PREMIUM ENGINEERING to the bankruptcy trustee, including the documents related to the suspicious transactions.

48.     PREMIUM ENGINEERING transferred funds without any security to several non-resident contractors for the supply of various goods, but the contractors have not supplied the goods or supplied an insignificant amount under a few contracts. The largest sums were

transferred to RMEC under five contracts ($52,288,612.79) and to Well Step Engineering Ltd. under six contracts ($23,551,797.98).

49.     The Moscow Court held the above-mentioned facts as true when it confirmed that Mr. Smyslov' acted in bad faith and held him liable for the PREMIUM ENGINEERING's debts on April 22, 2019.

50.     Summarizing the outcomes of the investigations, Applicant strongly believes that the above-mentioned companies and individuals were ultimately controlled by Mr. Smyslov and were likely used in embezzlement and fraudulent schemes to conceal and dissipates assets that should have been used to repay Applicant, namely:

1)   Anna Smyslova (Suponeva) ("Ms. Smyslova"): a Russian citizen and Mr. Smyslov's ex-wife (divorced March 2017). Ms. Smyslova was the director of companies used in Mr. Smyslov's fraudulent scheme;

2)   Kirill Pichugin: a Russian citizen who is Mr. Smyslov's nominee and manages several companies which were used in Mr. Smyslov's fraudulent scheme;

3)   Red Mountain Energy Corporation: the head company of the Red Mountain Group, incorporated in Nevada, and a judgment debtor in the Russian Proceedings. RMEC received payments of over $52 million from PREMIUM ENGINEERING;

4)   Red Mountain Energy CIS, LLC; Red Mountain Properties, LLC; Zhongtai America LLC; and Secure Energy International, LLC: members of the Red Mountain Group and managed by RMEC, incorporated in Nevada and Missouri;

5) CBM Partners Corporation: a Delaware company controlled by Mr. Smyslov, who was also receiving salary and/or bonuses from the company between 2009-2016. The company had two branches headed by Mr. Smyslov and Bruce J. Shaller, who appeared as treasurer, director and president;

6) Red Mountain Energy Holdings Inc. and Red Mountain Energy Overseas Ltd.: BVI companies owned by Mr. Smyslov, and indirect shareholders of PREMIUM ENGINEERING;

7) Technopress Limited: a Hong Kong published company controlled by Mr. Smyslov as reflected in his LinkedIn profile;

8) Red Mountain Far East Limited: a Hong Kong member of the Red Mountain Group, and a partner of PREMIUM ENGINEERING;

9) Well Step Engineering Limited and Del Credere Limited: Hong Kong companies organized and headed by Mr. Smyslov's nominee, Mr. Pichugin, and used in Mr. Smyslov's fraudulent scheme. Well Step Engineering Limited received over $23 million from PREMIUM ENGINEERING without consideration;

10) Blackcomb Finance Limited, Kuffner Investments Limited, and Strogatz Limited: Cyprus companies in which Mr. Smyslov was a director;

11) SK Inter Trading LLP: a United Kingdom company used in Mr. Smyslov's fraudulent scheme. This company is believed to have been used by Mr. Smyslov as the main company for extracting cash, and was managed by Mr. Smyslov through several offshore entities with hidden ownership structures;

12) 100Nuts Ltd. and 100 RIEŠUTŲ, MB: new businesses of Mr. Smyslov, incorporated in Lithuania and the United Kingdom;

13) UAB Senzo Baltic: a Lithuanian company used in Mr. Smyslov's fraudulent scheme and directed by Mr. Smyslov's ex-wife Anna Smyslova;

14) UAB 3d Engineering: a Lithuanian company used in Mr. Smyslov's fraudulent scheme and directed by a likely nominee of Mr. Smyslov, Christina Mkrtchyan; and

15) UAB Linguarus: a Lithuanian company used in Mr. Smyslov's fraudulent scheme, that made direct payments to Mr. Smyslov's nominee, Mr. Pichugin, and is directed by Stasys Zarakas, another likely nominee of Mr. Smyslov.

## II.    THE PENDING FOREIGN PROCEEDING AND FOREIGN TRIBUNAL

51.    Article 32 of the Russian Federal Law No. 127-FZ "On insolvency (bankruptcy)", as amended (the "Bankruptcy Law"), provides that cases of bankruptcy of a Russian citizen shall be heard by a Russian commercial court in accordance with the rules set out by the Arbitration Procedural Code of Russia.

52.    The Bankruptcy Law stipulates that an application for acknowledgement of an individual bankrupt shall be accepted by the court on condition that claims to the individual account for not less than RUB 500,000.00 (USD 6,368.46) and the claims are not satisfied within three months from the date when they had to be satisfied (Article 213.3, ¶2).

53.    A creditor can file an application for acknowledging an individual bankrupt only if there is a court decision that has entered into force and confirms the creditors' claims on monetary obligations (Article 213.5, ¶1).

54.     As mentioned above, Applicant initiated the Russian Proceedings at the end of 2015. In late 2017, Applicant brought a claim against Mr. Smyslov for his personal bankruptcy. On May 30, 2018 the Rostov Court opened bankruptcy proceeding against Mr. Smyslov and put the Bank's claim on Mr. Smyslov's bankruptcy register in the amount of RUB 323,412,781.66).[12]

55.     By the same judgment dated May 30 of 2018, the Court appointed Mr. Sergey V. Missarov as a bankruptcy trustee of Mr. Smyslov and imposed limitation on Mr. Smyslov's actions.

56.     On 26 November 2018, Mr. Smyslov was declared bankrupt and the Rostov Court commenced the sale of assets procedure, which is still on-going.

57.     The Bankruptcy Law states that the debtor (Mr. Smyslov) must provide to the Court, trustee and creditors extensive and accurate information about his or her assets. However, Mr. Smyslov has never appeared before the court and completely ignored the proceeding, even though his lawyer accepted the jurisdiction and specifically requested to remove the case to the Rostov Court.

58.     According to Article 213.28 ¶4 of the Bankruptcy Law, if the debtor fails to provide the necessary information or provides unreliable information to the Commercial Court regarding his bankruptcy estate, has concealed or intentionally destroyed his or her property, or defrauded creditors, the Commercial Court shall not release the debtor from his or her obligations to the creditors.

59.     Applicant, being a creditor of Mr. Smyslov, is considered by the Bankruptcy Law Code as the involved party to the bankruptcy proceeding (Article 34). The law entitles the

---

[12] USD 8,112,418.54 (Applied exchange rate (RUB to US$) 62.6420:1 as of May 30, 2018.

involved parties to exercise a wide range of rights. The Supreme Commercial Court of Russia specified in the Resolution of the Plenum dated June 22, 2012 No 35, that any involved party in a bankruptcy proceeding is allowed to participate in any hearing, present evidence on any matter, have full access to the case file and appeal the court's decisions (Para 2 Clause 3). Moreover, Article 213.32 of the Bankruptcy Law Code allows major creditors to challenge suspicious transactions of the debtor on specific grounds set forth by the law.

60.     Consistent with the exercise the above-mentioned rights under Russian Bankruptcy Law, Applicant is allowed and intends to introduce the evidence and records that it seeks to obtain under 28 U.S.C. § 1782 in the Russian Proceedings. The main purposes of the discovery procedure in the US are (1) to reveal Mr. Smyslov's business activities and present the real picture of his bankruptcy to the Russian Court, (2) identify Mr. Smyslov's concealed or destroyed assets, (3) challenge suspicious transactions, and (4) provide the Russian Court with substantial evidence that Mr. Smyslov should not be released from his obligations under Article 213.28 ¶4 of the Bankruptcy Law Code.

61.     Similarly, Applicant has been recognized as a creditor of PREMIUM ENGINEERING and is allowed to exercise the above-mentioned rights in the bankruptcy proceeding of the corporate entity (case file #: A40-127050/15).

**III.     THE CLAIM**

62.     Applicant's claim against Mr. Smyslov is a fraud claim arising under Article 213.28 ¶4 of the Russian Bankruptcy Law, whereby Applicant intends to show the Rostov Court that Mr. Smyslov has concealed and intentionally destroyed his property in order to defraud Applicant and avoid repayment of the Debt, and therefore Mr. Smyslov should not be released from his obligations to Applicant (the "Claim").

15

## IV.     NATURE OF THE DISCOVERY SOUGHT

63.     Applicant seeks assistance from the United States District Court for the Southern District of New York to obtain relevant and probative documentary evidence from:

 i.   Citibank, N.A., The Bank of New York Mellon, Société Générale, New York Branch, HSBC Bank USA, N.A., BNP Paribas USA, JPMorgan Chase Bank, N.A., Barclays Bank PLC, Deutsche Bank Trust Co. Americas, The Bank of Nova Scotia, New York Agency, UBS AG, Bank of America, N.A., Standard Chartered Bank US, Commerzbank AG, New York Branch (collectively, the "New York Banks"), and The Clearing House Payments Company, LLC ("TCH"). The New York Banks and TCH are commonly known to act as correspondent, intermediary, or otherwise clearing house banks for wire transfers passing from domestic banks to international banks, and vice versa (including but not limited to U.S. Dollar-denominated wire transfers).

 ii.   PayPal, Inc. ("PayPal") and MoneyGram Payment Systems, Inc. ("MoneyGram") (together with the New York Banks and TCH, the "Respondents"). PayPal and MoneyGram allow clients to make international and domestic payments online. The two companies deliver payments solutions for businesses and individuals and collect information about transactions, as well as other information associated with the transactions such as amount sent or requested, amount paid for products or services. Applicant intends to request records of transactions and experience information from PayPal and MoneyGram related to

Mr. Smyslov's business activities. PayPal and MoneyGram may collect Device and Geolocation Information, which may also allow Applicant to find out Mr. Smyslov's actual residential address and provide this information to the Court in the Russian Proceedings.

64.     Based on its investigation described above, Applicant has identified entities and individuals that are likely to be or have been used by Mr. Smyslov as tools or nominees in order to embezzle the creditors' money and conceal or misappropriate the debtor's assets. Therefore, Applicant seeks information relating to Mr. Smyslov and business entities and individuals that may have entered into fraudulent transactions with him, namely Denis D. Smyslov; Anna Smyslova; Kirill Pichugin; Red Mountain Energy Corporation; Red Mountain Energy CIS, LLC; Red Mountain Properties, LLC; Zhongtai America LLC; Secure Energy International; CBM Partners Corporation; Red Mountain Energy Holdings Inc; Technopress Limited; Red Mountain Far East Limited; Well Step Engineering Limited; Del Credere Limited; Red Mountain Energy Overseas Ltd.; Blackcomb Finance Limited; Kuffner Investments Limited; Strogatz Limited; SK Inter Trading LLP; 100NUTS Ltd.; 100 RIEŠUTŲ, MB; UAB Senzo Baltic; UAB 3d Engineering; and UAB Linguarus (collectively, the "Discovery Targets").

65.     Therefore, Applicant seeks to obtain meaningful information from the Respondents located in this District that are in the business of processing wire transfers and payments in New York City, and will have processed wire transfers and payments relevant and probative to advance Applicant's Claim in the Russian Proceedings and increase Applicant's chance of recovery. Specifically, Applicant seeks discovery to obtain evidence of intermediary bank transfers and payments, and documents relating thereto, to prove Mr. Smyslov has concealed his assets and defrauded creditors. The ultimate goal is to identify Mr. Smyslov's

assets, owned by him directly or indirectly, to allow the Rostov Court to be in a position to recognize that Mr. Smyslov has concealed his assets or intentionally destroyed them, in fraud of his creditors' rights and Applicant's in particular, and therefore not to release Mr. Smyslov of his obligations owed to Applicant, and eventually to seize Mr. Smyslov's assets and to distribute the proceeds among the creditors in accordance with the Russian Bankruptcy Law and applicable cross-border laws.

66.     Applicant seeks evidence maintained by the Respondents in New York City regarding wire transfers and payments, and documents relating thereto. Specifically, the discovery sought from the Respondents is evidence of wire transfers and payments routed through the Respondents in New York City revealing Mr. Smyslov's movement of funds, and the identity of other entities or individuals that may have engaged in suspicious transactions with Mr. Smyslov or his nominees and may have assisted Mr. Smyslov in dissipating and concealing his assets. Additionally, based on the fact that Mr. Smyslov set up businesses in the United States, it is very likely that wire transactions routed through New York City and documents relating thereto will reveal the information and payments sought by Applicant to identify Mr. Smyslov's assets and prove they were transferred in fraud of Applicant's rights, and satisfy Applicant's Claim in the Russian Proceedings, namely, transactions of value made with funds that should have been and (or) still can be used to satisfy the Debt owed to Applicant. Accordingly, the evidence sought is critical to satisfy Applicant's Claim. Additionally, Applicant seeks information pertaining to the location and whereabouts of Mr. Smyslov, in order to further show the court that Mr. Smyslov has intentionally fled Russia in order to avoid repayment to his creditors, and that he had in fact already planned to flee before his bankruptcy proceedings as he

had no intention to satisfy any judgment entered against him, furthering the fraudulent element of the Claim.

67.     I am advised by New York counsel that the Respondents, from whom discovery is sought, reside or are found in the Southern District of New York, within the meaning of 28 U.S.C. §1782.

68.     The Respondents are not expected to become a party to the Russian Proceedings, and as such, this Application constitutes the only practical and timely method for obtaining the needed evidence for use there. Indeed, absent the instant Application, the complete evidence would almost certainly remain outside the reach of the Russian courts.

69.     Further, there is no indication that the Russian courts would not be receptive to the documentary evidence sought through the instant Application. Such evidence is likely admissible in the Russian Proceedings. The Application does not circumvent any proof-gathering restriction under the laws of the Russian Federation.

70.     The discovery sought to be served on Respondents is not intrusive or unduly burdensome because it is of limited scope. Applicant seeks limited records relating to wire transactions for which the New York Banks and TCH were involved as originating bank, beneficiary bank, intermediate or correspondent bank to CHIPS, Fedwire, or where the New York Banks and TCH otherwise facilitated interbank funds transfers, and transaction information from PayPal and MoneyGram related to Mr. Smyslov's business activities and data prone to allow Applicant to locate Mr. Smyslov, as well as documents relating thereto, for the limited period beginning September 30, 2014 to the present. This period is likely within the Respondents' document retention policies and the documentary evidence sought is of the type

that Respondents regularly and easily retrieve and produce as third parties or actual parties in litigation.

## V.   APPLICANT SHOULD NOT BE REQUIRED TO GIVE NOTICE TO DENIS D. SMYSLOV, THE DISCOVERY TARGETS, AND THE RESPONDENTS

71.    Applicant has made a separate motion for filing the instant Applicant and supporting documents under seal, considering Mr. Smyslov is a sophisticated fraudster who has already proven to evade obligations, concealed evidence and assets, and fled Russia after covering his tracks.

72.    Applicant respectfully requests that (1) Applicant not be required to serve Mr. Smyslov, the Discovery Targets, or the Respondents with this Application and, (2) should the Court grant this Application, that Applicant not be required to serve Mr. Smyslov and the Discovery Targets with the order granting the Application.

73.    As explained above, the discovery sought from the Respondents will assist Applicant in revealing Mr. Smyslov's financial and business activities over the period preceding his bankruptcy. The documentary evidence will also assist Applicant in identifying the concealed or dissipated assets of Mr. Smyslov, owned by him directly or indirectly, or at least will provide the information about the sources of funds that have been used by Mr. Smyslov starting from September 30, 2014. This information and evidence is crucial for the Russian Proceedings, because it will allow Applicant to challenge suspicious transactions (if any revealed) and show the Rostov Court that Mr. Smyslov should not be released from his obligations owed to Applicant and that any proceeds recovered from the suspicious transactions should be distributed among the creditors of Mr. Smyslov in accordance with the Russian Bankruptcy Law, including Applicant.

74.     Based on the aboved-mentioned facts, Applicant has a good faith reason to believe that Mr. Smyslov has dissipated and concealed his assets that should have been used to satisfy the Debt, in order to evade its obligation to pay the Debt owed to Applicant.

75.     In light of the above, notice of the Application and of the order granting the Application (should the Court grant the Application), would provide Mr. Smyslov the opportunity to potentially conceal or destroy evidence that could be used by Applicant in the Russian Proceedings and (or) further divert its assets, and would delay and undermine Applicant's full understanding of Mr. Smyslov's movement of assets and discovery of the identity of other entities or individuals that may have assisted Mr. Smyslov in concealing or dissipating his assets.

76.     The information sought through this *ex parte* Application is the only practical and efficient way Applicant can obtain the discovery sought. Applicant would be significantly delayed in obtaining critical information needed in the Russian Proceedings if the Court requires notice of the Application and order granting the Application, which would ultimately prejudice Applicant.

77.     Conversely, there would be no prejudice to the party against whom the discovery is likely to be used – namely Mr. Smyslov, the debtor in the Russian Proceedings – as he would be permitted to contest any evidence submitted by Applicant to the Rostov Court in Russia, during the Russian Proceedings irrespective of how such evidence was obtained.

## VI.     CONCLUSION

78.     In light of the foregoing, Applicant respectfully submits that all of the requirements of 28 U.S.C. § 1782 are met:

    a.   The Respondents reside and/or are found in this District;

      b.  Applicant is an "interested person" within the meaning of the statute; and

      c.  Applicant seeks to obtain documents and testimony for use in a foreign proceeding.

79.    To my knowledge no previous application for this relief has been made in the United States.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _5th_ day of _July_, 2021, in _Moscow, Russia_.

By: _/s/ Dmitry I. Bogorodsky_